TOPIC 2: Stating you were "further berated for asking and taking the next Saturday (4/3/2021)
for a memorial service marking the one year passing of my mother."

    a.  With regard to Mr. McColley "further berating" you, what is the date this occurred?

      **- Friday April 2nd, 2021**

b. Where did this occur?

      **-Over the phone, to the best of my recollection.**

c. Are there any other individuals with information about this incident?

      **-Not that I am aware.**

d. Was anyone else present when this occurred?

      **-No.**

e. Did you tell anyone about this incident?

      **- Again, my father and my friend Matt Warden.**

f. Did you inform any supervisor of SEW of this incident?

      **-Again, the offending party was my supervisor. I was not sure, at that time, of how
to proceed.**


CONFIDENTIAL


FILE COPY

 

TOPIC 3: "He further made comments about me having a nice car, a 'Jewish Ride' and I heard him refer to it to a colleague when they thought I was out of earshot as a 'perfect car for a kike.'"

    a.  What is the date this occurred?

        **- Wednesday March 31st 2021 during our weekly in person sales meeting in the Pennsauken NJ office.**

  b. Where did this occur?

        **- In the Pennsauken NJ office.**

  c. Who is the "colleague" that you have referenced?

        **- Joe Brenner**

  d. Are there any other individuals with information about this incident?

        **-Not that I am aware. Not my place to say.**

  e. Was anyone else present when this occurred?

        **-In theory all the solar analysts are present at the Wednesday meeting. But the bulk of this occurred during what are termed "one on ones" (meetings to discuss individual performance). Solar analysts come and go after the group compulsory part of the meeting or speak to the crews about pending projects in other parts of the office.**

  f. Did you tell anyone about this incident?

        **- Again, my father and my friend Matt Warden.**

  g. Did you inform any supervisor of SEW of this incident?

        **-Again, initially I was not sure how to proceed as one of the offending parties was my direct supervisor. I was so stunned by the gravity of the offense and I was at a loss as how to proceed; like a deer in the headlights. Again my HR onsite and the like. As all the offenses piled up, I sought advice and compiled my incidents and filed a complaint with the EEOC. I believe part of what set off Mr. Brenner was my refusal to accept a donut because**



FILE COPY          CONFIDENTIAL

it was the Passover holiday and I could not eat leavened foods. He had brought them in for

the office and the meeting.

 **FILE COPY**   *CONFIDENTIAL*

TOPIC 4: You have raised concerns about not being permitted to take off on Saturday. For your position as a Solar Analyst, Saturday is typically the busiest day of the week.

a. Were you made aware that your position required work on Saturday?

-Yes, but it was my assumption that for religious Holidays and/or religious occasions exemptions from work would be made. As is both customary and required under the law. I am not at issue with working Saturdays but I am at issue with working Holidays or other religious occasions of deep religious significance to me personally. I worked for SEW on Saturdays during my employment and conducted solar appointments as directed.

b. Please identify all other Solar Analyst who you believe were treated more favorably because they were permitted to take off Saturdays.

-That is not the issue at play here (any kind of favoritism). The issue is the attempted denial and subsequent verbal berating that occurred because of the legitimate right to take off a holidays and/or occasions of religious significance. Also, my mother's memorial was of religious significance as for Jews a year after the passing a stone is unveiled to mark someone's grave in what is known as an "unveiling". As I am a Reform Jew it is permissible to do that on the Sabbath, which is a Saturday, in this case Saturday April the 3rd 2021.

FILE COPY

CONFIDENTIAL

TOPIC 5: "On 4/12/2021 and 04/13/2021 my direct supervisor, Will McColley again verbally berated me for failing to make sales when I referenced technology issues that stemmed from a mental/learning disability he berated me further and with malice."

   a. Where did this occur?

     **-Over the phone, to my best recollection.**

b. What are the "technology issues" that you have referenced?

     **-As a solar analyst, I was required to use many SunRun and DocuSign applications that were often times confusing to me. Additionally, getting my computer to work in clients homes or in different working environments.**

c. Are there any other individuals with information about this incident?

     **-Not that I'm aware of but once again that's not my place to know.**

d. Was anyone else present when this occurred?

     **-Not on my end of the call but I can't speak to my supervisor's end.**

e. Did you inform any supervisor of SEW of this incident?

     **- Again, HR is not on site and I was bewildered as to how to proceed given that the offending party was my direct supervisor. Ultimately my bewilderment let me to seek advice and finally file an EEOC complaint.**

f. To the extent you are seeking a reasonable accommodation for a "mental/learning disability," please describe in full the accommodation you are seeking.

     **-Greater assistance and time with technological applications and an environment free of hostility at difficulties with technological applications. These are all fair accommodations under the Americans with Disabilities Act of 1990 and its subsequent amendments.**

 

TOPIC 6: In SEW'S letter dated April 16, 2021, on page 2, in Point 6, SEW raised concerns regarding failure to carry out an assigned lead. In your response, in the left margin to Point 6, you wrote "4/13/2021 = EEOC Protection Not Relevant."

a. Please explain your response further.

-As previously stated, anything after April 13th 2021 falls under the protection of my EEOC complaint. It is my right to remove myself from situations where I feel unsafe. I was referring to many points that attempted to assail my character based on my removal of myself from what I deemed to be unsafe conditions.

b. Why do you believe it is "not relevant" that SEW believes you were not performing your job duties?

-I performed my duties up until such point that I filed an EEOC complaint and availed myself of those protections. I didn't feel that it was relevant because they were not issues being raised about my job performance but instead retaliatory measures aimed at discrediting me. I always perform my job to the best of my abilities prior to the EEOC complaint. Even under what I have revealed, which can certainly be deemed a "hostile work environment and conditions".

 **FILE COPY**

CONFIDENTIAL

TOPIC 7: In your response to SEW's April 16, 2021 letter, on page 4 you wrote "I don't feel safe,

I have a right to remove myself from unsafe conditions."

    a.  Explain why you did not feel safe.

      **-I stated this in previous answers and I do not feel I need to belabor the point.**

b. Identify everyone at SEW to whom you expressed a concern about not feeling safe.

      **-As previously stated, there was no one to express this too as HR was not on site. Additionally, I was in a state of shock and upheaval as how to deal with this given the gravity of what was place before me in terms of all the incidents. Additionally, my direct supervisor was also the offending party as previously stated.**

c. What is the date that you "removed yourself" from the "unsafe conditions"?

      **-The EEOC complaint was filed on the evening of April 13th, 2021 and I drafted my letter to Stephanie Boyd in the Human Resources Department on the early morning of April 14th 2021. That is the point at which I felt things had reached such a point as that I was not safe in my own estimation to return to the Pennsauken NJ office.**



April 16, 2021

**VIA FEDEX**
Mr. Jordan Breslow
314 S. Henderson RD
Unit G-103
King of Prussia, PA 19406

**VIA EMAIL**
Jordanbreslow93@gmail.com

Re:    Investigatory Leave
       <u>PRIVILEGED AND CONFIDENTIAL</u>

Dear Mr. Breslow:

This letter is to inform you that you are being placed on investigatory leave, effective immediately, for all purposes and from your position with Solar Energy World, LLC ("SEW").

**A.    INVESTIGATORY LEAVE**

SEW will be investigating various issues described herein, including, but not limited to, incidents related to reports of gross misconduct and dereliction of your primary job duties. SEW cannot permit you to continue performing work, engaging with co-workers, and interacting with homeowners (all required aspects of your position) until it has had the opportunity to investigate these and any related matters. If the investigation indicates that disciplinary action is warranted, SEW reserves the right to take further corrective action, including terminating your services, during the investigatory leave.

**B.    GENERAL DESCRIPTION OF ALLEGED CONDUCT**

The general basis for your placement on leave is the Performance Related Issues described below.  This investigation is in its initial stage, and the basis may change or modify as the investigation continues.  SEW has not made any determination with regard to any of the below allegations, and is only investigating these issues at this stage.

**Performance Related Issues:**

1.    Your employment commenced on March 15, 2021.
2.    You were scheduled to attend a mandatory meeting on April 12, 2021 at 9:00 a.m.  At approximately 8:57 a.m., three minutes prior to the meeting start time, you communicated that you would not attend the meeting.

Mr. Jordan Breslow
April 16, 2021
Page 2 of 5

3. Since April 13, 2021, SEW has been generally unable to establish communication with you. Indeed, it is believed that you may have abandoned your position as of April 13.

4. On April 14, 2021, you failed to attend a weekly sales meeting. Your supervisor, Will McColley, was unable to contact you, and you did not respond to his message.

5. As a Solar Analyst, handling and carrying out sales leads is the primary duty of your job. You had a sales lead scheduled for April 14, 2021 at 5:00 p.m. When Mr. McColley was unable to establish communication with you, Mr. McColley attempted to confirm and handle the lead himself. Ultimately, the lead was lost, which appears largely attributable to your failure to communicate. This may have resulted in a significant financial loss to the company byway of losing the sale of a residential solar system to a homeowner.

6. On April 15, 2021, another significant sales lead issue arose. The customer has reported to SEW that an in-home sales meeting was confirmed, that then you attempted to change it to a virtual-meeting, and that you then never followed up any further. This lead appears to have now been lost which, again, may have potentially caused a significant financial loss to the company byway of losing the sale of another residential solar system.

Points 1-6, above, are collectively referred to herein as "Performance Related Issues."

**Investigation of EEOC Inquiry**

Equal Opportunity Employer: SEW is an equal opportunity employer and is committed to equal opportunity without regard to an employee's actual or perceived race, religion, color, sex (including pregnancy), age, ancestry, national origin, citizenship, disability, marital status, sexual orientation, gender identity, genetic information, or any other basis of discrimination prohibited by applicable local, state or federal law. This policy applies to all terms and conditions of employment, including, but not limited to, the following: (1) recruitment, hiring, placement, transfer, promotion, and demotion; (2) training and development; (3) compensation and benefits; (4) educational, social and recreational programs; (5) discipline; and (6) termination of employment. Employment decisions, subject to the legitimate business requirements of SEW, are based solely on an individual's qualifications, merits, behavior and performance.

Americans with Disabilities Act: SEW also complies with the Americans with Disabilities Act (ADA), as well as state and local laws, in ensuring equal employment opportunities for qualified persons with disabilities. All employment practices and activities are conducted on a non-discriminatory basis. Qualified individuals with disabilities are entitled to be treated equally

Mr. Jordan Breslow
April 16, 2021
Page 3 of 5

with other employees in terms of pay, benefits, and other forms of compensation (or changes in compensation), as well as in opportunities, assignments, classifications and position descriptions. SEW is also committed to not discriminating against any qualified employees or applicants because they have a history of having a disability, are related to or associated with a person with a disability, or are regarded as having a disability.

<u>Policy Against Retaliation</u>: Any employee, who, in good faith, files a complaint or participates in a related investigation, may not be subjected to reprisal or retaliation as a result of filing the complaint or participating in the investigation. Those involved in investigating the incident will make every effort to strike a balance between the parties' desires for privacy and the need to conduct a fair and effective investigation. Violation of the EEOC or ADA policies described above may subject the violating employee to disciplinary action, up to and including termination. Likewise, there may be disciplinary measures or termination if, in fact, it is determined that the reported incident and/or accusations were fabricated.

<u>Your EEOC Inquiry</u>: On or about April 15, 2021, you sent a FedEx package to SEW containing the following:

1. 5-page document with a submission date of 4/13/2021 and entitled "EEOC (INQUIRY) NUMBER: 530-2021-02878";
2. 2-page document dated 4/13/21 and entitled "Your Appointment is Scheduled"; and
3. 32-page document, marked "confidential," entitled "Report of Psycho-Educational Evaluation," and which appears to be from on or around June of 2010 and from the time you were 16 years old.

The documents described above are collectively referred to as "EEOC Inquiry." Prior to receipt of the EEOC Inquiry, SEW is unaware of previously receiving any other information, complaints, or concerns from you relating to any of the issues described therein.

In your EEOC Inquiry, you assert allegations relating to your supervisor, including allegations that you believe he discriminated against you on the basis of religion and disability. SEW takes your EEOC Inquiry seriously. Your EEOC Inquiry will be reviewed and we anticipate that we will contact you in order to obtain additional information. In the interim, please direct all correspondence and inquires relating to the EEOC Inquiry to Stephanie Boyd, Director of Human Resources (sboyd@solarenergyworld.com).

In your EEOC Inquiry, you allege that the illegal actions begun on April 1, 2021, approximately two-weeks after your employment begun. As noted, your EEOC Inquiry (received on April 15,

Mr. Jordan Breslow
April 16, 2021
Page 4 of 5

2021) was the first notice SEW received of any of the concerns described therein.  In addition, it appears that immediately after submitting your EEOC Inquiry on or about April 13 with the EEOC, you discontinued performing all of your required job responsibilities and ceased communicating with your supervisor (despite his multiple attempts to contact you).  *See* Performance Related Issues, described above.

**C.     DURING INVESTIGATION**

During the investigatory leave period, you: (1) are relieved of all of your duties at SEW and shall not perform any work; (2) are not permitted to enter SEW offices; (3) may not communicate with any employees, customers, potential customers, leads, vendors, sales representatives, or subcontractors of SEW; (4) may not access work email or systems; and (5) may not engage in any conduct intended to interfere with SEW's investigation.

SEW will endeavor to promptly compete this investigation by approximately **April 26, 2021.** However, due to the seriousness and potential complexity of this matter, your investigatory leave may be extended at SEW's discretion and as necessary.

**SEW requests that you make yourself reasonably available during your leave in order to participate in any investigative interviewing that may be requested and to ensure SEW can complete its investigation in a timely manner.  SEW may email you a written questionnaire to complete and provide additional information on the issues described herein.  If you do not make yourself available or respond to SEW's emails, SEW will proceed with the investigation and make a determination based on the information available.**

At the commencement of this leave, you must immediately return all SEW property, including: (1) company computer; (2) company phone; (3) other company electronic equipment; (4) keys; (5) company files; (6) company records; and (7) any other similar or related SEW property that is in your possession. You are instructed to not delete any emails, text messages, documents and/or other relevant materials created during your time as an SEW sales representative.

You will be paid through today (despite a concern that you abandoned your position as of April 13). However, because you are under review for Performance Related Issues that potentially constitute gross misconduct, your leave will be without pay. if the investigation does not indicate disciplinary action is warranted and you agree to return to your prior position, then you will be paid for the time missed while on investigatory leave.  If the investigation indicates that disciplinary action is warranted, SEW reserves the right to take further corrective action, up to and including termination, during the investigatory leave.

Mr. Jordan Breslow
April 16, 2021
Page 5 of 5

We appreciate your cooperation in this matter and hope that the situation will be resolved in a manner that is satisfactory to all parties involved.

Solar Energy World, LLC, *by:*

_Stephanie Boyd_     04/16/2021

Signature           Date

---
Mr. Jordan Breslow        Date
*NOTE: Your signature only confirms your receipt of this letter, not your agreement to its contents.*

Stephanie Boyd

---
Printed Name

**Sunrun Vendor Code of Conduct**
*(Adopted on January 1, 2019)*

## OUR VALUES



Sunrun's mission is to create a planet run by the sun. To accomplish that mission, Sunrun believes in being a global citizen with a responsibility to minimize our environmental impact in all aspects of our operations, providing a safe and diverse place to work for our employees, and ensuring robust corporate governance practices. For Sunrun, this is the definition of good business, and one that we believe will make the strongest long-term impact on society. As Sunrun communicates to its own employees, its commitment to doing business ethically and legally means that we will only work with vendors and suppliers who share the same commitment.

To be a part of the Sunrun team means to operate with absolute integrity. Because Sunrun places such a high priority on ethical and legal conduct, we require all of our vendors to read, understand and comply with our Vendor Code of Conduct ("Code") and all other conditions of doing business with Sunrun. This Code goes beyond mere compliance with the law. When differences arise between standards and legal requirements, the stricter standard shall apply, in compliance with applicable law.

The Code applies to all vendors who provide goods and services to Sunrun or any of its subsidiaries. Failure to conduct business in a manner that meets these standards could result in a termination of the vendor relationship with Sunrun.

This document summarizes Sunrun's expectations from its vendors, sub-vendors and their workers. No code can cover all policies or laws, so if you have any questions about any of the information in this Code, or what is expected of you, please email audit@sunrun.com.

In addition, if you suspect unethical or illegal business practices, it is your responsibility to report them using the resources identified in this Code.

Thank you for your commitment to upholding our high standards of conduct. Together, we can maintain and build upon Sunrun's reputation for respect and excellence.

## RESPONSIBILITIES OF SUNRUN VENDORS

Sunrun requires all of its vendors to abide by the following standards while conducting business with or on behalf of Sunrun:

### BUSINESS INTEGRITY AND ETHICS

**Ethics**
Sunrun is committed to conducting its business in accordance with the highest ethical standards and in compliance with applicable laws, rules and regulations. We expect our vendors to share our values and uphold our standards. We also expect our vendors to develop policies and programs as appropriate to ensure that all workers understand and adhere to these standards, as well as those set forth in the Sunrun Code of Business Conduct and Ethics.

**Conflicts of Interest**
Sunrun employees are required to avoid not only conflicts of interest, but also activities that could give the appearance that a vendor improperly influenced them in order to receive favorable treatment. Sunrun's vendors are required to avoid actions that may result in conflicts of interest, which include offering, providing or reimbursing personal gifts, favors, personal travel expenses, lodging, or other housing, services of any kind, excessive meals or entertainment, or any other thing of value to Sunrun employees.

Vendors are required to promptly disclose all information regarding financial and personal relationships, arrangements with Sunrun employees, representatives, or their close relatives, as that could appear to influence the outcome of an agreement and potentially create a conflict of interest.

**Anti-Corruption & Money Laundering**
Vendors are required to comply with all applicable anti-corruption and money laundering laws including, but not limited to, the U.S. Foreign Corrupt Practices Act. Under no circumstances may a vendor working for Sunrun offer, promise or provide anything of value directly or indirectly to a government official for the purpose of exerting improper influence or to obtain or retain an improper benefit or advantage.

**Whistleblower Protection**
Sunrun is committed to maintaining high standards of financial integrity and takes very seriously all complaints and concerns regarding accounting, internal accounting controls, auditing and other legal matters, including violations of Sunrun's Code of Business Conduct and Ethics. Sunrun prohibits retribution or retaliation in any way against any person who has in good faith made a complaint or reported a concern, or against any person who assists in any investigation. Sunrun requires that vendors also strive for open communication of their workforce to raise these types of concerns without fear of retaliation.

### WORKING CONDITIONS, LABOR PRACTICES AND HUMAN RIGHTS

**Slavery, Human Trafficking & Involuntary Labor**
Everyone deserves to be treated with dignity and respect, and Sunrun recognizes its responsibility to protect human rights. Vendors must not use forced labor — slave, prison, indentured, bonded, or otherwise — and Sunrun will not knowingly work with vendors who engage in these practices or permit their subcontractors to engage in these practices. Working must be voluntary, and workers must be free to leave work and terminate their employment or other work status with reasonable notice.

Additionally, vendors must not engage in or support human trafficking and are encouraged to implement due diligence measures to ensure that no human trafficking exists within their extended supply chains.

2

**Child Labor**
Sunrun does not tolerate the use of underage labor and will not knowingly work with vendors that utilize underage workers. Sunrun defines underage workers as any individual younger than the local minimum working age or the age of 15, whichever older, and/or those not abiding by the international standards as defined by the International Labor Organization ("ILO") regarding age appropriate work governing family farming. Furthermore, workers under the age of 18 must not perform hazardous work. Sunrun expects its Vendors to comply with all age-related working restrictions as set by local law and adhere to international standards as defined by the ILO regarding age appropriate work.

**Working Hours**
Vendors should not require workers to work more than the regular and overtime hours allowed by the law of the jurisdiction where such workers are employed or perform work.

**Discrimination**
Vendors must treat their workers with respect and dignity at all times. Sunrun requires its vendors to comply with all applicable laws regarding discrimination in hiring and employment practices. We expect vendors to maintain a workplace free of discrimination, harassment, victimization, and any other form of inappropriate behavior or abuse, and to employ workers based on their ability to perform the work, without regard to irrelevant characteristics such as age, disability, genetic information, medical condition, ethnic or national origin, gender, gender identity, gender expression, ancestry, nationality, race, color, sex (including pregnancy, childbirth, breastfeeding or related medical conditions), sexual orientation, marital status, political affiliation, religious beliefs, union affiliation, military or veteran status, or any unlawful criterion under applicable law. All vendors will ensure that workers receive equal treatment in all aspects of employment regardless of race, ethnicity or gender.

**Wages and Benefits**
Sunrun encourages its vendors to commit to the betterment of wages and benefits to improve the lives of workers and their families. Compensation paid to workers should comply with all applicable wage laws, including those relating to minimum wages, overtime hours and legally mandated benefits. Compensation shall be provided in a way that is timely and easily understood. Deductions from wages as a disciplinary measure are not permitted. Sunrun recommends that vendors offer their workers ample training and educational opportunities.

**Vendor Diversity and Inclusion**
Diversity is a social and economic imperative and Sunrun encourages its vendors to share this belief. Vendors are expected to demonstrate a commitment to inclusive business practices, including diversity in their workplace, and deliver innovative solutions that reflect diverse experiences, thoughts, and identities throughout their business.

**Freedom of Association**
Sunrun seeks to work with vendors who productively engage workers and value them as critical assets to sustainable business success. This includes respecting the rights of workers to make informed decisions as to whether to associate or not with any group, consistent with all applicable laws. Vendors are expected to permit workers to openly communicate and share grievances with management about working conditions without fear of reprisal or harassment.

3

## HEALTH AND SAFETY

**Health & Safety**

Sunrun is committed to ensuring safe and injury-free workplaces. Achieving this goal requires the support, commitment and dedication of Sunrun's vendors. Vendors are required to:

- Provide workers with a safe and healthy work environment.
- Fully comply with all applicable health and safety laws, regulations, and practices, including those relating to occupational safety, emergency preparedness, occupational injury and illness, industrial hygiene, physically demanding work, machine safeguarding, sanitation, food, and housing.
- Demonstrate a cultural commitment to maintaining a safe working environment, and take adequate steps to minimize the causes of hazards inherent in the working environment.
- Ensure that all required permits, licenses and registrations are obtained, maintained and kept up-to-date.
- Ensure that all workers are qualified and equipped to perform activities safely and responsibly.

## ENVIRONMENTAL PROTECTION AND SUSTAINABILITY

**Environment**

Sunrun strives to work with vendors that share its commitment to a better, greener and kinder planet. Sunrun strives to minimize its environmental impact in all aspects of its operations, and seeks to do business with vendors that embody this goal.

**Responsible Mineral Sourcing**

Sunrun expects its vendors to provide it only with products that contain responsibly sourced commodities. Vendors that supply products that include minerals sourced from conflict-affected and high-risk areas (including, but not limited to, cobalt, wolframite (titanium), cassiterite (tin), tungsten, or gold) must ensure that the sourcing of these minerals does not knowingly contribute – directly or indirectly — to armed conflict, including terrorist financing or human rights violations. Sunrun expects the sourcing of these minerals to occur in a manner consistent with the OECD Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas.

## PROTECTION OF ASSETS AND INTELLECTUAL PROPERTY

**Intellectual Property**

Vendors are required to protect Sunrun's intellectual property including trademarks, patents, copyrights, business methodologies, and trade secrets. Vendors may not use any of Sunrun's intellectual property or confidential information except as provided in the vendor's contract. Vendors have a duty to keep proprietary information strictly confidential and protected from disclosure.

**Security and Privacy**

Sunrun expects its vendors to protect confidential information. Vendors must comply with all applicable privacy, data protection, and information security laws and regulations. Vendors must adopt and maintain processes to provide reasonable protections for personal, proprietary and confidential information, including information that they access, receive or process on Sunrun's behalf. Vendors should recognize that unauthorized use or disclosure of any such information may have personal, legal, reputational and financial consequences for the vendor, individuals whose personal information may be impacted, and for Sunrun.

4

<u>REPORTING</u>

**Monitoring and Enforcement**

To ensure vendors abide by this Code, Sunrun may conduct periodic audits of its vendors to ensure compliance with this Code and applicable laws and regulations. Vendors will cooperate with any information requests or audits Sunrun may initiate to confirm their fulfillment of these responsibilities. If there is a reasonable basis to believe a vendor is in violation of this Code, Sunrun may terminate its relationship with such vendor and impose restrictions on future business unless the violation is promptly corrected. Sunrun aims to survey vendors that comprise at least 80% of total value transacted with Sunrun, along with new vendors, seeking affirmations that the vendor is aware of and compliant with the Code. Sunrun requires statements of compliance be completed and executed by an officer employed by the vendor.

**Reporting Violations**

Sunrun expects its vendors to follow the law and the information in this Code, and promptly report any actual or suspected violations, including violations by any Sunrun employee or individual acting on behalf of Sunrun or one of its vendors.

**How to Report**

- Call: (855) 477-8862
- Website: www.sunrun.ethicspoint.com
- Email: audit@sunrun.com or via electronic mail to the Company's General Counsel.
- Write to: Sunrun Inc., 595 Market Street, Floor 29, San Francisco, CA 94105.

You may elect to remain anonymous if you report via the hotline. All reported violations that include specific information will be investigated and appropriate action will be taken.

### VENDOR'S CERTIFICATION OF COMPLIANCE

By agreeing to perform work with or on behalf of Sunrun Inc., the Vendor acknowledges its acceptance of the Vendor Code of Conduct and its intention to comply with its requirements.

Officer Signature    _____

Officer Name (Printed) _____

Title    _____

Company name    _____

Date    _____

v190103                                5

Sunrun Inc. Annual report pursuant to Section 13 and 15(d)

## Litigation

The Company is subject to certain legal proceedings, claims, investigations and administrative proceedings in the ordinary course of its business. The Company records a provision for a liability when it is both probable that the liability has been incurred and the amount of the liability can be reasonably estimated. These provisions, if any, are reviewed at least quarterly and adjusted to reflect the impacts of negotiations, settlements, rulings, advice of legal counsel and other information and events pertaining to a particular case. Depending on the nature and timing of any such proceedings that may arise, an unfavorable resolution of a matter could materially affect the Company's future consolidated results of operations, cash flows or financial position in a particular period.

In July 2012, the U.S. Treasury Department and the Department of Justice (together, the "Government") opened a civil investigation into the participation by residential solar developers in the Section 1603 grant program. The Government served subpoenas on several developers, including Sunrun, along with their investors and valuation firms. The focus of the investigation is the claimed fair market value of the solar systems the developers submitted to the Government in their grant applications. The Company has cooperated fully with the Government and plans to continue to do so. No claims have been brought against the Company. The Company is not able to estimate the ultimate outcome or a range of possible loss at this point in time.

On November 20, 2015, a putative class action captioned *Slovin et al. v. Sunrun Inc. and Clean Energy Experts, LLC*, Case No. 4:15-cv-05340, was filed in the United States District Court, Northern District of California. The complaint generally alleged violations of the Telephone Consumer Protection Act (the "TCPA") on behalf of an individual and putative classes of persons alleged to be similarly situated. Plaintiffs filed a First Amended Complaint on December 2, 2015, and a Second Amended Complaint on March 25, 2016, also asserting individual and putative class claims under the TCPA. By Order entered on April 28, 2016, the Court granted the Company's motion to strike the class allegations set forth in the Second Amended Complaint, and granted leave to amend. Plaintiffs filed a Third Amended Complaint on July 12, 2016 asserting individual and putative class claims under the TCPA. On October 12, 2016, the Court denied the Company's motion to again strike the class allegations set forth in the Third Amended Complaint. On October 3, 2017, plaintiffs filed a motion for leave to file a Fourth Amended Complaint, seeking to, among other things, revise the definitions of the classes that plaintiffs seek to represent. The Company has opposed that motion, which remains pending before the Court. In each iteration of their complaint, plaintiffs seek statutory damages, equitable and injunctive relief, and attorneys' fees and costs, on behalf of themselves and the absent classes. Plaintiffs' deadline to file their motion for class certification is currently April 13, 2018.

Most, if not all, of the claims asserted in the lawsuit relate to activities allegedly engaged in by third-party vendors, for which the Company denies any responsibility. The vendors are contractually obligated to indemnify the Company for losses related to the conduct alleged. The Company believes that the claims are without merit and intends to defend itself vigorously.

1/1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JUSTIN LEE, *et al.*, | * | |
| Plaintiffs, | * | Civil Action No. RDB-19-1993 |
| v. | * | |
| SOLAR ENERGY WORLD, LLC, *et al.*, | * | |
| Defendants. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM OPINION**

Plaintiffs Justin Lee, Kanayo Okeke, Garrett Ellenberger, Christopher Riley, Jordan Jackson, Dustin Hamann, Darrin Johnson, Jr., Jeffrey Williams, Evelio Rodriguez, Ryan Maggio, Evan Christensen, Michael Winson, Kevone Richardson, and Oscar Mazariegos-Flores (collectively "Plaintiffs"), on behalf of themselves and others similarly situated, bring this action against Defendants Solar Energy World, LLC ("Solar Energy World"), Tope Lala ("Lala"), Aloysius E. Gleeson ("Gleeson"), and Geoff Mirkin ("Mirkin") (collectively, "Defendants"), seeking all available relief under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, and the Maryland Wage and Hour Law ("MWHL"), Md. Code Ann., Lab. & Empl. § 3-401, *et seq.*, and the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code Ann., Lab. & Empl. § 3-501, *et seq.*  (ECF No. 5.)[1]  Currently pending before this

---

[1] Plaintiffs' Amended Complaint (ECF No. 5) was filed on September 5, 2019 with consent of the named Plaintiffs to join this collective action.  On July 29, 2020, Plaintiffs filed a line to add three additional consents to join the collective action (ECF No. 22).

1

Court is the Plaintiffs' Motion for Conditional Collective Action Certification and Court-Facilitated Notice. (ECF No. 18.)[2]

The parties' submissions have been reviewed, and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2018). For the reasons that follow, Plaintiffs' Motion for Conditional Collective Action Certification and Court-Facilitated Notice (ECF No. 18) is GRANTED IN PART and DENIED IN PART. Specifically, a collective action is conditionally certified for a class consisting of **all individuals who work or worked as an electrician or installer at Solar Energy World's Maryland facility and worked more than 40 hours in a workweek without being paid overtime at any time from December 19, 2017 to present.**

## BACKGROUND

In the context of the pending motion, this Court "accept[s] as true all well-pleaded facts in [the] complaint and construe[s] them in the light most favorable to the plaintiff." *See Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (citing *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015)). The Plaintiffs in this case were each employed by Defendant Solar Energy World in 2017 and 2018. (ECF No. 5 ¶¶ 5-17.) Solar Energy World is in the business of installing solar panel systems in and around Maryland, Washington. D.C., Pennsylvania, and New Jersey. (*Id.* ¶ 19.) The company is run by President and owner Tope Lala, Chief Executive Officer and owner Geoff Mirkin, and member, owner, and/or officer Al Gleeson. (*Id.* ¶¶ 20-22.)

---

[2] Also pending is the Defendants' Motion for Leave to File Sur-reply (ECF No. 25). This Court GRANTS the Defendants' Motion and has taken the Sur-reply (ECF No. 26) into consideration in this matter.

Solar Energy World hires "Solar Installers" and "Company Electricians" to install solar panels purchased from the company at the purchaser's requested location. (*Id.* ¶¶ 31.) The Defendants typically hire these electricians and installers at an hourly rate, however, the Defendants, at their discretion, retain the ability to convert the electricians' and installers' payment to paying per panel installed ("Panel Pay"). (*Id.* ¶ 33.) Plaintiffs allege that the Defendants pay electricians and installers the lesser of the hourly pay rate and the Panel Pay rate. (*Id.*)

On a typical workday, installers and electricians employed by Solar Energy World's Maryland facility physically report, as required, to the Elkridge, Maryland company headquarters at 6:00 a.m., where they receive their job assignments for the day. (*Id.* ¶ 34.) The electricians and installers then load their vehicles with the necessary supplies and drive to their assigned installation sites, which are allegedly often at least one hour away. (*Id.*) Electricians and installers typically stop work at their installation sites around 4:00 p.m., however, they sometimes continue working at the sites until 6:00 or 7:00 p.m. if the job can be completed within the day. (*Id.* ¶ 35.) The electricians and installers then drive back to the headquarters in Elkridge, Maryland to return the company's vehicles. (*Id.* ¶ 36.) Some job assignments require installers to work multiple days on one site and/or on weekends. (*Id.* ¶¶ 34, 37.)

According to the Plaintiffs, the Defendants consider the workday of electricians and installers to begin at 6:00 a.m. and to end at 4:00 p.m., for a total of ten hours per day. (*Id.* ¶ 35.) The Defendants allegedly do not consider any time the individuals work past 4:00 p.m. at an installation site and specifically instruct their electricians and installers not to include the time spent driving back to headquarters to return the company's vehicles on their daily time

3

sheets. (*Id.* ¶¶ 35-36, 41.) The Plaintiffs allege that between the minimum ten-hours days, weekend shifts, and time spent driving back to headquarters at the end of each day, electricians and installers are often subjected to working 70 hours, or more, each week. (*Id.* ¶ 38.)

Plaintiffs, all hired as electricians or installers by Solar Energy World's Maryland facility, allege that despite their work weeks being in excess of 40 hours, they did not receive overtime payments. (*Id.* ¶ 39.) They assert that when they inquired about overtime, they were told that the company did not pay overtime. (*Id.* ¶ 40.) They also allege that they did not perform any work that would qualify them as "exempt" employees under federal or Maryland law. (*Id.* ¶ 48.) Accordingly, on July 8, 2019, the Plaintiffs filed a Complaint against the Defendants. (ECF No.1.) The now operative Amended Complaint, filed September 5, 2019, asserts that in failing to properly compensate the Plaintiffs and others similarly situated for hours spent working, the Defendants have acted willfully and with reckless disregard of clearly applicable provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, and the Maryland Wage and Hour Law ("MWHL"), Md. Code Ann., Lab. & Empl. § 3-401, *et seq.*, and the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code Ann., Lab. & Empl. § 3-501, *et seq.* (ECF No. 5.)

On April 25, 2020, the Plaintiffs filed the instant Motion for Conditional Collective Action Certification and Court-Facilitated Notice, seeking to conditionally certify a class consisting of "all individuals employed by Solar Energy World LLC, engaged in installing or assisting in installing solar panels for Solar Energy World, LLC, at any time during the period beginning three years prior to the date of commencement of this action, through the date of judgment." (ECF No. 18-1.) With the onset of the global COVID-19 pandemic, the

4

Defendants were given an 84-day extension to file a response. *See* Standing Order 2020-07.

On July 31, 2020, the Defendants filed a Response in Opposition to the Plaintiffs' motion,

arguing that the Plaintiffs' request was overly broad in terms of the scope of employees they

sought to be included in the class as well as in the temporal scope. (ECF No. 23.) On August

14, 2020, the Plaintiffs filed a Reply in which they agreed to some modifications of the original

certification request, narrowing the scope to include solely the employees of the Defendants'

Maryland facilities who worked more than 40 hours in a week without overtime pay. (ECF

No. 24.) The parties, however, continue to disagree as to the proper temporal scope of the

class and as to some details regarding the notice that should be provided to putative class

members. (ECF Nos. 23, 24.)

## STANDARD OF REVIEW

Under the Fair Labor Standards Act ("FLSA"), a plaintiff may bring an action on behalf

of himself and other employees so long as the other employees are "similarly situated" to the

plaintiff. 29 U.S.C. § 216(b); *see also Quinteros v. Sparkle Cleaning, Inc.,* 532 F. Supp. 2d 762, 771

(D. Md. 2008); *Baylor v. Homefix Custom Remodeling Corp.,* 443 F. Supp. 3d 598, 605 (D. Md.

2020). As this Court previously noted, Section 216 of the FLSA "establishes an 'opt-in'

scheme, whereby potential plaintiffs must affirmatively notify the court of their intentions to

be a party to the suit." *Quinteros,* 532 F. Supp. 2d at 771 (citing *Camper v. Home Quality Mgmt.,*

*Inc.,* 200 F.R.D. 516, 519 (D. Md. 2000)). Section 216(b) provides, in relevant part, that:

> An action . . . may be maintained against any employer . . . in any Federal or
> State court of competent jurisdiction by any one or more employees for and on
> behalf of himself or themselves and other employees similarly situated. No
> employee shall be a party plaintiff to any such action unless he gives his consent
> in writing to become such a party and such consent is filed in the court in which
> such action is brought.

29 U.S.C. § 216(b).

Whether to grant conditional certification is left to the court's discretion. *Syrja v. Westat, Inc.*, 756 F. Supp. 2d 682, 686 (D. Md. 2010) (stating that "[d]eterminations of the appropriateness of conditional collective action certification . . . are left to the court's discretion[]"); *see also Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 169 (1989). This Court employs a two-step inquiry when deciding whether to certify a collective action under the FLSA. *Syrja*, 756 F. Supp. 2d at 686; *Banks v. Wet Dog Inc.*, No. CIV.A. RDB-13-2294, 2015 WL 433631, at *1 (D. Md. Feb. 2, 2015). First, upon a minimal evidentiary showing that a plaintiff can meet the substantive requirements of 29 U.S.C. § 216(b), the plaintiff may proceed with a collective action on a provisional basis. Second, following discovery, the court engages in a more stringent inquiry to determine whether the plaintiff class is "similarly situated" in accordance with the requirements of § 216. *Rawls v. Augustine Home Health Care, Inc.*, 244 F.R.D. 298, 300 (D. Md. 2007) (internal citations omitted). The court then renders a final decision regarding the propriety of proceeding as a collective action. *Id.* The second, more "stringent" phase of collective action certification under the FLSA is often prompted by a defendant's filing of a motion to decertify, and thus is referred to as the "decertification stage." *Syrja*, 756 F. Supp. 2d at 686.

## ANALYSIS

### A. Plaintiffs have sufficiently pled that they are similarly situated to other electricians and installers employed by the Maryland facility and who worked over 40 hours a week without overtime pay.

The "paramount issue in determining the appropriateness of a conditional class certification is whether plaintiffs have demonstrated that potential class members are 'similarly

6

situated.'" *Williams v. Long*, 585 F. Supp. 2d 679, 684 (D. Md. 2008). Plaintiffs bear the burden of showing that their claims are "similarly situated," but courts have ruled that "similarly situated" need not mean "identical." *See, e.g., Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1217 (11th Cir. 2001). This Court has held that a group of FLSA plaintiffs is similarly situated if they can show that they were victims of a common policy, scheme, or plan that violated the law. *Butler v. DirectSAT USA, LLC*, 876 F. Supp. 2d 560, 566 (D. Md. 2012) (citing *Mancia v. Mayflower Textile Servs. Co.*, No. CCB-08-273, 2008 WL 4735344, at *3 (D. Md. Oct. 14, 2008)).

A plaintiff's allegations thus "must consist of more than 'vague allegations' with 'meager factual support,' but [they] need not enable the court to reach a conclusive determination whether a class of similarly situated plaintiffs exists." *Mancia*, 2008 WL 4735344, at *2 (quoting *D'Anna v. M/A–COM, Inc.*, 903 F. Supp. 889, 893 (D. Md. 1995)). Plaintiffs may rely on "affidavits or other means" to make the required showing. *Williams*, 585 F. Supp. 2d at 683; *see also Bouthner v. Cleveland Const., Inc.*, No. RDB-11-0244, 2012 WL 738578, at *4 (D. Md. Mar. 5, 2012); *Ruiz v. Monterey of Lusby, Inc.*, No. DKC 13-3792, 2014 WL 1793786, at *1-2 (D. Md. May 5, 2014). If, however, "sufficient evidence in the record at the initial 'notice' stage makes it clear that notice is not appropriate, . . . a court can . . . deny certification outright." *Syrja*, 756 F. Supp. 2d at 686 (quoting *Purdham v. Fairfax Cnty. Pub. Sch.*, 629 F. Supp. 2d 544, 547 (E.D. Va. 2009)).

Plaintiffs initially asserted that they and all employees of Solar Energy World involved in installations were similarly situated because they were subject to the same company-wide policy or practice of violating FLSA's overtime requirements paying electricians and installers per panel installed, rather than based on time spent on the job, traveling, and working at

headquarters. Specifically, the Plaintiffs alleged that (1) their job duties were substantially similar, if not the same; (2) Plaintiffs were paid a combination of hourly and Panel Pay; (3) Plaintiffs were not credited hours for return trips from their respective job sites despite being required by the Defendants to return the company's vehicles to headquarters; (4) were not paid overtime in an amount one and half times their hourly rate for hours worked in excess of 40 hours a week; and (5) plaintiffs had no control over where their assignments were located. (ECF No. 18-1 at 10.)

In opposition, the Defendants urged this Court to deny conditional certification of the Plaintiffs' proposed class, arguing that the description of those individuals "similarly situated" was overbroad in two respects. (ECF No. 23.) First, they argued that Plaintiffs' request for certification of a nationwide class including all electricians and installers at all Solar Energy World facilities should be denied, because the Plaintiffs had failed to demonstrate that any electricians or installers others than those who worked out of the Maryland facility were similarly situated to them. (*Id.*) Second, the Defendants argued that the class should additionally be limited to the electricians and installers "who worked in excess of 40 hours in a workweek and did not receive overtime compensation." (*Id.*) In response to the Defendants' opposition, the Plaintiffs agreed to modify their original request, and now seek to join a more limited scope of individuals, namely, "[a]ll individuals who work or worked as an electrician or installer at Solar Energy World's Maryland facility and worked more than 40 hours in a workweek without being paid overtime." (ECF No. 24.)

A class of this scope is consistent with the decisions of this Court. With respect to limiting the class to those employed at the Maryland facility, such restriction is consistent with

8

this Court's opinion in *Faust v. Comcast Cable Comm'ns Mgmt., LLC,* No. WMN-10-2336, 2011 WL 5244421, at *4 (D. Md. Nov. 1, 2011). In *Faust,* the plaintiffs sought to conditionally certify a class of employees at eight of the defendants' Maryland call centers, however, the plaintiffs had failed to provide any concrete evidence demonstrating that employees at call centers other than the one at which the plaintiffs worked was subjected to the same allegedly improper policy. *Id.* Accordingly, this Court limited the class to the individuals employed at the single call center. *Id.* With respect to limiting the class to those who worked more than 40 hours a week without overtime pay, such limitation is again consistent with the decisions of this Court. For example, in *Baylor,* the class was defined as all "[i]ndividuals who work or worked in excess of 40 hours in a seven day workweek and did not receive compensation." 443 F. Supp. 3d at 608.

The Plaintiffs' new proposed conditional class is also at this time an accurate description of those who are similarly situated to the Plaintiffs. The Plaintiffs have offered no evidence that electricians and installers at Solar Energy World's other facilities have been subjected to the Defendants' alleged policy of not paying for driving time and overtime work. However, through their common allegations supported by affidavits, pay stubs, personal time logs, screen shots of text messages, and spreadsheets showing hours worked, the Plaintiffs have made the requisite showing that they and other employees at the Maryland facility were similarly situated as electricians and installers for Solar Energy World and subject to the same alleged policy. The Plaintiffs' have met their burden to show that they are similarly situated to the proposed class.

**B. The collective action will be limited to those individuals who assert overtime claims and worked for the Defendants within three years of this Court's Order plus 81 days.**

In their pleadings (ECF Nos. 18, 24), the Plaintiffs have argued that the appropriate time period for certification of the class should date back three years prior to the date of the commencement of this case (July 8, 2019) or at least to the date on which they filed for conditional certification (April 25, 2020). However, the clear precedent of this Court is to look to the date of the granting of conditional collective action certification. The FLSA provides that in a collective action suit, the statute of limitations runs for each plaintiff until the plaintiff files a written consent opting into the suit. *See* 29 U.S.C. § 256(b). In practice, this typically means that the operative time period for certification of a class is the three-year period preceding the date that the court enters an order granting collective action certification. *See Baylor*, 443 F. Supp. 3d at 608 (defining conditional class to include those who met the class description in the three years prior to the date of the order granting conditional certification of the collective action); *see also Hernandez v. Immortal Rise, Inc.*, 11-CIV-4360 (RRM) (LB), 2012 WL 4369746, at *7 (E.D.N.Y. 2012) (noting that the notice period is generally measured from the date of the court's order granting the plaintiffs' motion for conditional certification).

However, this Court has the discretion to equitably toll limitations where "'extraordinary circumstances beyond plaintiffs' control made it impossible to file the claims on time.'" *Cruz v. Maypa*, 773 F.3d 138, 146 (4th Cir. 2014) (quoting *Harris v. Hutchinson*, 209 F.3d 325, 330 (4th Cir. 2000) (internal quotation marks omitted)). Courts have equitably tolled the statute of limitations in FLSA actions in cases involving unusual delays in the court's consideration of a motion for conditional certification caused by the procedural posture of the

10

case. *See Harbourt v. PPE Casino Resorts Maryland, LLC*, Nos. CCB-14-3211, CCB-16-339, 2017 WL 281992, at *3 (D. Md. Jan. 23, 2017) (citing *Ruffin v. Entm't of the E. Panhandle*, No. 3:11-CV-19, 2012 WL 28192, at *2 (N.D. W.Va. Jan 5, 2012)).

In this case, the unprecedented COVID-19 pandemic clearly prevented the Plaintiffs from obtaining certification of their collective action in the usual time period for such actions. The Plaintiffs filed their Motion for Conditional Collective Action Certification and Court-Facilitated Notice on April 25, 2020. (ECF No. 18.) Two weeks prior, on April 10, 2020, Chief Judge Bredar of this Court issued Standing Order 2020-07 in which this Court ordered that all filing deadlines in all cases originally set to fall between March 16, 2020, and June 5, 2020 were extended by 84 days. The Defendants took advantage of this extension, waiting 81 days past what would have been their original deadline to file their Response in Opposition on July 31, 2020. (ECF No. 23.) The Plaintiffs were in no part at fault for this delay, and therefore, this Court finds that the statute of limitations was tolled for that 81-day period. Accordingly, the conditional class will include all individuals who met the above defined description at any time three years prior to December 19, 2020, 81 days prior to this Memorandum Opinion. In other words, the collective action will include claims arising between December 19, 2017 and the present.

### C. Definition of the class.

Accordingly, for the reasons stated above, Plaintiffs' motion will be granted in part and denied in part, and this Court will conditionally certify a collection action consisting of **all individuals who work or worked as an electrician or installer at Solar Energy World's**

11

Maryland facility and worked more than 40 hours in a workweek without being paid overtime at any time from December 19, 2017 to present.

### D. Notice form.

The Plaintiffs have made a preliminary showing that the installers and electricians at Solar Energy World's Maryland facility who worked more than 40 hours a week without being paid overtime are "similarly situated," therefore, notice of this action will be provided to installers and electricians who currently work, or have worked Solar Energy World's Maryland facility since December 19, 2017. *See Butler*, 876 F. Supp. 2d at 574. Pursuant to the FLSA, a Notice of Collective Action "must provide accurate and timely notice to potential plaintiffs so they may make informed decisions about whether to join a collective action." *Arnold v. Acappella, LLC*, BPG-15-3001, 2016 WL 5454541, at *4 (D. Md. Sept. 29, 2016). However, "[t]he district court has broad discretion regarding the 'details' of the notice sent to potential opt-in plaintiffs." *Id.* (citing *Mcfeeley v. Jackson St. Entm't, LLC*, DKC 12-1019, 2012 WL 5928902, at *5 (D. Md. Nov. 26, 2012); *see also Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 171 (1989). While the parties have made efforts to reconcile several of their disagreements as to the contents of the proposed Notice of Collective Action form, several issues regarding the proposed notice remain unresolved. The Court's determinations on these issues are addressed in turn below.

#### 1. Defendants' will supply Plaintiffs with contact information for putative plaintiffs in fifteen days.

Plaintiffs request that the Defendants be required to produce within fifteen days a computer-readable database of names, last known addresses, e-mail addresses, and the dates of employment for all current and former electricians and installers who have worked for

12

Defendants at any point since three years before the date of the filing of this lawsuit. (ECF No. 24 at 7.)  As this Court has determined that the appropriate temporal scope of the conditional class will be three years prior to December 19, 2020, the Defendants will be required to produce only the above-listed information for individuals employed by the Maryland facility since December 19, 2017.  "In keeping with this Court's previous notice procedures," the deadline for that disclosure will be within fifteen days of this Court's Order. *See Baylor*, 443 F. Supp. 3d at 608 (citing *Jones v. Fidelity Resources, Inc.*, RDB-17-1447, 2018 WL 656438, at *4 (D. Md. Feb. 1, 2018)).  In sum, the Defendants are directed to provide Plaintiffs with the names and last known home and email addresses and dates of employment of all individuals employed at the Defendants' Maryland facility any point during the collective action period within fifteen days.

### 2. Notice will be posted at the Maryland facility.

Plaintiffs request that, in addition to being authorized to mail notice to employees, the Defendants should be required to post notice at their Maryland and New Jersey facilities in areas accessible to and easily viewed by the electricians and installers, as well as in the vehicles used by the electricians and installers to travel to their installation projects. (ECF No. 24 at 5.)  This Court has often held that a requirement that the defendant post notice at a physical facility to which employees are required to report is appropriate.  *See Baylor*, 443 F. Supp. 3d at 609; *Randolph v. PowerComm Const., Inc.*, 7 F. Supp. 3d 561, 577 (D. Md. 2014); *Williams v. ezStorage Corp.*, No. RDB-10-3335, 2011 WL 1539941, at *5 (D. Md. Apr. 21, 2011).  In light of the Plaintiffs' allegations that the electricians and installers of the Maryland facility are required to report to Solar Energy World's headquarters in Elkton, Maryland, physical posting

13

of the notice at the Maryland headquarters is appropriate. However, the Defendant will not be required to post notice at its other facilities outside Maryland, nor in the vehicles used by electricians and installers. This Court believes that posting notice at the Maryland facility, in addition to mailing such notice, is sufficient to notify potential class members in this case.

### 3. Opt-in period with no reminder notice.

As noted by the Plaintiffs, the Defendants did not object to the 90-day opt-in period requested by the Plaintiffs. (ECF No. 24 at 2.) As this Court provided in *Baylor*, 90 days is the "standard" notice period for potential plaintiffs to opt-in, and in order for this Court to find another period is appropriate, the Defendants must provide a "persuasive basis to deviate" from the 90-day standard. 443 F. Supp. 3d at 609 (citing *Mendoza v. Mo's Fisherman Exchange, Inc.*, No. ELH-15-1427, at *20 (D. Md. June 22, 2016)). Given that the Defendants provided no such basis, the standard 90-day period is appropriate in this case. However, the Plaintiffs do not prevail on their request that they be allowed to send a reminder notice halfway through the 90-day opt-in period. As this Court also noted in *Baylor*, "a reminder notice is not necessary as such notices have the potential to 'stir up litigation.'" 443 F. Supp. 3d at 609 (citing *Calderon v. Geico General Ins. Co.*, No. RWT 10cv1958, 2011 WL 98197, at *8 (D. Md. Jan. 12, 2011)). Plaintiffs will be given the standard 90-day period for potential plaintiffs to opt-in, along with the ability to post the notice at Defendants' facility in Maryland. The Court is satisfied that these procedures will be sufficient to notify potential class members of their ability to opt-in. Accordingly, Plaintiffs are not authorized to issue a reminder notice.

### 4. Defense counsel's contact information may be included in some form.

14

The Plaintiffs agreed to include defense counsel's contact information on the notice, however, Plaintiffs objected to the format of the Defendants' proposed notice and opt-in form, which included such contact information under the heading "Questions." (ECF No. 24 at 6.) Inclusion of defense counsels' contact information in the notice is consistent with this Court's decisions ordering the inclusion of similar contact information in other cases. *See Arevalo v. D.J's Underground, Inc.*, No. DKC-09-03199, 2010 WL 2639888, at *4 (D. Md. June 29, 2010). However, identifying defense counsel as a resource individuals may use to answer questions and provide information about this litigation may be confusing to potential plaintiffs. They may be led to believe that defense counsel would provide them with objective information and advice. As this Court is tasked with "ensur[ing] that potential plaintiffs are not misled about the consequences of joining a class in an ongoing employment dispute," *Aytch v. Trulife Health Servs., LLC*, No. ELH-17-2796, 2018 WL 1784461, at *5 (D. Md. April 12, 2018) (internal quotations and citations omitted), defense counsel's contact information should be presented in a manner that makes it clear to potential class members that the listed attorneys represent the *Defendants* and the *Defendants' interests*. This Court encourages the parties to use a format similar to that of the parties in *Baylor*, included in Plaintiffs' Reply. (ECF No. 24 at 6.)

### 5. Language regarding court costs is not required.

Finally, the Defendants in this case request that the notice include language informing putative plaintiffs that they may be assessed court costs and expenses if they choose to join the collective. (ECF No. 23-1.) As this Court "generally does not include such notifications of potential liability in notices to a proposed class," such information will not be required in

the notice in this case. *See Aytch*, 2018 WL 1784461, at *5 (citing *McFeeley v. Jackson St. Entm't, LLC*, No. DKC-12-1019, 2012 WL 5928902, at *5 (D. Md. Nov. 26, 2012)).

The parties shall confer and submit a joint proposed notice consistent with these determinations, within seven (7) days of the date of this Memorandum Opinion and Order.

## CONCLUSION

For the reasons stated above, the Plaintiffs' Motion for Conditional Collective Action Certification and Court-Facilitated Notice (ECF No. 18) is GRANTED IN PART and DENIED IN PART. Specifically, it is GRANTED as to the conditional certification of a class consisting of "all individuals who work or worked as an electrician or installer at Solar Energy World's Maryland facility and worked more than 40 hours in a workweek without being paid overtime." However, it is DENIED with respect to Plaintiffs' request that the time period for certification be based on the date of the filing of this case or the request for conditional certification. The conditional class will include those who matched the above description "at any time from December 19, 2017 to present." The Motion is further GRANTED IN PART and DENIED IN PART as to the contents and manner of the proposed Notice. The parties shall be directed to confer and submit a joint proposed notice consistent with the determinations set forth herein. Defendants are directed to provide Plaintiffs with the names and last known home and email addresses and dates of employment of all collective action members within the next fifteen days.

16

A separate Order follows.

Dated: March 10, 2020

                                                    _____/s/_____
                                                    Richard D. Bennett
                                                    United States District Judge